RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DONALD RAY MIDDLEBROOKS,

*Plaintiff-Appellant*,

*v.*

No. 20-5419

TONY PARKER, in his official capacity as Tennessee's
Commissioner of Correction; TONY MAYS, in his
official capacity as Warden of Riverbend Maximum
Security Institution,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-01139—William Lynn Campbell, Jr., District Judge.

Argued: February 9, 2021

Decided and Filed: October 15, 2021

Before: MOORE, CLAY, and WHITE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Richard Lewis Tennent, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR
THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellant. Miranda
Jones, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for
Appellee. **ON BRIEF:** Richard Lewis Tennent, Kelley J. Henry, James O. Martin, III, Amy D.
Harwell, Katherine Dix, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE
MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellant. Miranda Jones,
Scott Sutherland, Rob Mitchell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellee.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.  Donald Ray Middlebrooks appeals the district court's order dismissing, as barred by res judicata, his 42 U.S.C. § 1983 action asserting facial and as-applied challenges to the constitutionality of Tennessee's lethal-injection protocol. We **AFFIRM IN PART, REVERSE IN PART,** and **REMAND.**

**I.**

In 1989, a jury convicted Middlebrooks of felony murder and aggravated kidnapping and sentenced him to death.  *See State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992).  His death sentence was vacated by the Tennessee Supreme Court, *id.* at 347, but on remand, the jury resentenced him to death.  *See State v. Middlebrooks*, 995 S.W.2d 550 (Tenn. 1999).  After a lengthy procedural history that is not relevant to this appeal, Middlebrooks's conviction and death sentence were upheld on direct and collateral review.  *See Middlebrooks v. Carpenter*, 843 F.3d 1127, 1129-34 (6th Cir. 2016) (setting forth the procedural history in Middlebrooks's case).  In this suit, Middlebrooks challenges Tennessee's chosen method for carrying out his death sentence.

When Middlebrooks was resentenced to death, electrocution was Tennessee's only method of execution.  In 2000, Tennessee adopted lethal injection as the default method of execution. Tenn. Code § 40-23-114 (2000).  Under current law, electrocution is still an option for execution, but only if (1) an inmate sentenced to death before 1999 chooses execution by electrocution; (2) lethal injection is declared unconstitutional; or (3) the Commissioner of the Tennessee Department of Correction (TDOC) certifies that a necessary lethal-injection ingredient is unavailable. Tenn. Code § 40-23-114(a)-(e).  Middlebrooks has attested that he will not choose execution by electrocution.  In 2013, the TDOC, responsible for implementing lethal injection, adopted a single dose of pentobarbital as the lethal-injection protocol.  On January 8, 2018, it adopted a three-drug protocol of midazolam, vecuronium bromide, and potassium chloride as an alternative to pentobarbital.  In February 2018, Middlebrooks and other death row

inmates filed a declaratory action in the state chancery court asserting a facial challenge to the constitutionality of the three-drug protocol.  *See Abdur'Rahman v. Parker*, 558 S.W.3d 606 (Tenn. 2018).

The inmates designated pentobarbital as an alternative means of execution.  *Id*. at 612. Tennessee then eliminated the pentobarbital protocol on July 5, 2018, leaving the three-drug protocol as its only lethal-injection protocol.  *Id*.  The state trial court held a ten-day trial in July 2018 and dismissed the complaint because the plaintiffs "failed to prove that their proposed alternative method of execution, a one-drug protocol using pentobarbital, is available to the Defendants."  *Id*. at 623.  The Tennessee Supreme Court affirmed, concluding that the plaintiffs failed to meet their burden of proving that pentobarbital was available as an alternative means of execution, even though other states used pentobarbital in executions:

> We will not judge the reasonableness of Tennessee's efforts to obtain lethal injection drugs by the ability of other states to do so.  *See Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1302 (11th Cir. 2016) ("We expressly hold that the fact that other states in the past have procured a compounded drug and pharmacies in Alabama have the skills to compound the drug does not make it available to the ADOC for use in lethal injections in executions."), *cert. denied sub nom. Arthur v. Dunn*, ⸺ U.S. ⸺, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017), *reh'g denied*, ⸺ U.S. ⸺, 137 S.Ct. 1838, 197 L.Ed.2d 777 (2017). Proof that lethal injection drugs are available with ordinary transactional effort requires more than mere speculation, more than just a showing of hypothetical availability.  *See In re Ohio Execution Protocol*, [860 F.3d 881, 891 (6th Cir. 2017)] (discounting testimony that the witness "believed 'there are pharmacists in the United States that are able to compound pentobarbital for use in lethal injections because other states have been reported to have obtained compounded pentobarbital for use in executions,'" because "that is quite different from saying that any given state can actually locate those pharmacies and readily obtain the drugs").  The fact that other states have or can obtain pentobarbital for executions is not proof that Tennessee can do so with ordinary transactional effort.  *See id.*
>
> The trial court ruled that the Plaintiffs failed to prove that their proposed alternative method of execution, a one-drug protocol using pentobarbital, is available to the Defendants.  The Plaintiffs offered no direct proof as to availability of this alternative method of execution.  All of the Plaintiffs' expert witnesses confirmed that they were not retained to identify a source for pentobarbital and that they had no knowledge of where TDOC could obtain it. The Plaintiffs attempted to prove availability of pentobarbital by discrediting the testimony of the following witnesses for the Defendants: the TDOC Commissioner, the TDOC Deputy Commissioner for Administration, and the

Warden of Riverbend Maximum Security Institution who is responsible for carrying out executions.

The trial court found nothing in the demeanor of these TDOC officials, nor the facts to which they testified, to overcome the presumption that they had discharged their duties in good faith and in accordance with the law. *See West v. Schofield*, [460 S.W.3d 113, 131 (Tenn. 2015)]. The trial court found convincing their testimony that TDOC would use pentobarbital if it were available, because this Court recently upheld the one-drug protocol using pentobarbital. *See West v. Schofield*, [519 S.W.3d 550, 552 (Tenn. 2017)]. We agree with the trial court that the Plaintiffs' argument—that TDOC would not make a good-faith effort to locate pentobarbital—defies common sense. Moreover, the trial court accredited the testimony of the TDOC officials, finding them all to be credible. We will not second-guess the trial court's credibility determinations without clear and convincing evidence to the contrary, which this record does not contain. *See King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013).

The Commissioner and the Deputy Commissioner provided testimony regarding TDOC's unsuccessful efforts to obtain pentobarbital for use in the lethal injection protocol. The trial court found that "they proceeded reasonably as department heads to delegate the task of investigating supplies of pentobarbital to a member of their staff." A PowerPoint presentation, introduced as part of trial exhibit 105, detailed those unsuccessful efforts. The trial court found "that trial exhibit 105 and the testimony of the TDOC officials establish that Tennessee does not have access to and is unable to obtain [pentobarbital] with ordinary transactional effort." Our review of this finding of fact is accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d) ("Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise.").

The Plaintiffs assert that uncontroverted proof shows pentobarbital was available for purchase in 2017 and would still be good for use in executions in 2019 and 2020. They also contend that the Defendants have (1) a physician willing to write a prescription for pentobarbital, (2) a pharmacy and pharmacist with the proper licensing to obtain pentobarbital, and (3) two contracts with two different compounding pharmacists to compound pentobarbital for executions. None of this evidence is relevant, however, if pentobarbital is not now available. The Plaintiffs' argument—that the Defendants acted in bad faith by choosing not to obtain pentobarbital when it was feasible and readily available—is totally inconsistent with the trial court's credibility determinations. We conclude that the evidence does not preponderate against the trial court's finding that Tennessee does not have access to and is unable to obtain pentobarbital with ordinary transactional effort for use in lethal injections.

In summary, we agree with the trial court's finding that pentobarbital—the only alternative method of execution that the Plaintiffs sufficiently pleaded—is not available for use in executions in Tennessee. Therefore, the Plaintiffs failed to carry their burden of showing availability of their proposed alternative method of execution, as required under the *Glossip* [*v. Gross*, 576 U.S. 863 (2015),] standard set forth by the United States Supreme Court and recently adopted in *West v. Schofield* for state constitutional purposes. As we noted earlier, this requirement is an independent requirement, separate and apart from the requirement to prove that the protocol creates a demonstrated risk of severe pain. Therefore, for this reason, we hold that the Plaintiffs failed to carry their burden to establish that Tennessee's current three-drug lethal injection protocol constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution or article I, section 16 of the Tennessee Constitution. As a result, we need not address the Plaintiffs' claim that the three-drug protocol creates a demonstrated risk of severe pain.

558 S.W.3d at 623-25 (footnotes omitted).

In December 2019, Middlebrooks filed this action against TDOC Commissioner Tony Parker and the Riverbend Maximum Security Institution Warden, Tony Mays. Middlebrooks's amended complaint alleges that Tennessee's lethal-injection protocol is unconstitutional on its face, and unconstitutional as applied to him because of his unique physical and mental conditions. He proposes pentobarbital and nitrogen hypoxia as alternatives to the three-drug protocol and alleges that pentobarbital is widely available for executions, in part because it is being used by other states and the federal government. He also relies on the Supreme Court's decision in *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), and a May 2019 opinion from the Department of Justice's Office of Legal Counsel (OLC), the latter of which permitted states to import drugs for use in lethal injection without Food and Drug Administration (FDA) interference, *see Whether the Food and Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. ___ (May 3, 2019), slip op., 2019 WL 2235666.

The defendants moved to dismiss Middlebrooks's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). They argued that Middlebrooks's claims were barred by the statute of limitations and by res judicata, and lacked merit.

The district court granted Defendants' motion and dismissed the complaint, finding that res judicata applied. As to Middlebrooks's facial claim, the district court concluded that Middlebrooks's reliance on *Bucklew* was misplaced because *Bucklew* "did not abrogate or modify the existing standard" but "merely clarified that the same standard applied to all challenges to methods of execution—both as-applied and facial." R. 26, PID 342. The district court found that the May 2019 OLC opinion was not a basis for Middlebrooks to avoid the application of res judicata because the OLC opinion did not have the effect of law, it conflicted with a prior decision of the D.C. Circuit, and it had no practical effect on Tennessee's ability to import pentobarbital. The district court also concluded that nitrogen hypoxia has been an alternative method of execution since at least 2016 and therefore reliance on that proposed alternative is also barred by res judicata.[1]

As to Middlebrooks's as-applied challenge, the district court noted that Middlebrooks had the same physical and mental-health conditions at the time of the *Abdur'Rahman* litigation and that lethal injection has been the presumptive method of execution since 2000. Therefore, the district court concluded that Middlebrooks could have raised the as-applied challenge in the earlier litigation. The district court did not reach Defendants' other arguments for dismissal, and the parties do not address those arguments on appeal.

## II.

We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Shuler v. Garrett*, 743 F.3d 170, 172 (6th Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard requires the plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

---

[1]Middlebrooks does not contest this aspect of the district court's ruling.

The only issue in this appeal is whether Middlebrooks's facial and as-applied claims are barred by res judicata due to the Tennessee Supreme Court's decision in *Abdur'Rahman*. "The Full Faith and Credit Act, 28 U.S.C. § 1738, originally enacted in 1790, ch. 11, 1 Stat. 122, requires the federal court to 'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986)). Under Tennessee law, the party invoking res judicata must show that (1) a court of competent jurisdiction rendered the underlying judgment, (2) the same parties or their privies were involved in both suits, (3) the same claim or cause of action was or could have been asserted in both suits, and (4) the underlying judgment was final and on the merits. *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012) (citing *Lien v. Couch*, 993 S.W.2d 53, 56 (Tenn. Ct. App. 1998)). However, the doctrine of res judicata "does not prevent a re-examination of the same question between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of the litigants." *Creech v. Addington*, 281 S.W.3d 363, 381 (Tenn. 2009) (internal quotation mark omitted) (quoting *Banks v. Banks*, 77 S.W.2d 74, 76 (Tenn. Ct. App. 1934)). And the Supreme Court has recognized that "where 'important human values—such as the lawfulness of continuing personal disability or restraint—are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) (quoting Restatement (Second) of Judgments § 24, Comment *f* (1982)).

## A.

We first address Middlebrooks's facial challenge. Middlebrooks does not dispute that the *Abdur'Rahman* decision was rendered by a court of competent jurisdiction, the same parties were involved in both suits, the same claim—that the three-drug protocol violates the Eighth Amendment's provision prohibiting cruel and unusual punishments—was asserted in both suits, and the judgment was final and on the merits. The parties confine their arguments to whether Middlebrooks has plausibly alleged changed facts or circumstances that alter the legal rights of the parties sufficient to avoid the res judicata bar. *See Creech*, 281 S.W.3d at 381. Because *Abdur'Rahman* was decided against the plaintiffs based solely on their failure to establish that

pentobarbital was available as an alternative means of execution, the parties correctly focus only on that element of Middlebrooks's Eighth Amendment claim. *See Glossip*, 576 U.S. at 877-78 (discussing the elements of an Eighth Amendment claim challenging a method of execution).

Middlebrooks argues that the post-*Abdur'Rahman* facts he alleges, accepted as true, allow us to draw the reasonable inference that pentobarbital is available to Tennessee for use in executions. We agree. First, Middlebrooks points to evidence indicating that the federal government has access to pentobarbital, including an October 2019 filing in the United States District Court for the District of Columbia that the federal government obtained pentobarbital from a domestic bulk manufacturer; and a July 2019 statement by then-Attorney General William P. Barr that pentobarbital is "widely available," R. 13 PID 188 (quoting Katie Benner, *U.S. to Resume Capital Punishment for Federal Inmates on Death Row*, N.Y. Times, July 25, 2019).[2] Middlebrooks also alleges facts showing that states have access to pentobarbital, including that in 2019 five states carried out fourteen executions using pentobarbital; that the May 2019 OLC opinion made it possible for states, including Tennessee, to obtain pentobarbital from foreign manufacturers; and that three states have either obtained a license to import pentobarbital or are in the process of applying for one. *See also Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (per curiam) (describing pentobarbital as "a mainstay of state executions"). Finally, Middlebrooks alleges, based on the substance of heavily redacted emails, that Tennessee is struggling to obtain the drugs in the three-drug protocol, is considering importing pentobarbital, and may have a source of pentobarbital. Taken together, Middlebrooks has pled plausible post-*Abdur'Rahman* facts that allow us to reasonably infer that pentobarbital is available to Tennessee from a domestic supplier or through importation.

---

[2]Defendants argue that "[t]his may not be an accurate representation of United States Attorney General William Barr's statements, though it is an accurate representation of a New York Times article." Appellees' Br. at 9 n.2. Although the underlying Department of Justice press release does not state that pentobarbital is widely available, *see* Press Release, Dep't of Justice, *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse* (July 25, 2019), https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse, the New York Times article may have been relying on information not in the press release. Because we are reviewing the grant of a motion to dismiss, we accept this allegation as true for purposes of this appeal.

Defendants first counter that the bulk of Middlebrooks's post-*Abdur'Rahman* allegations are conclusory. We disagree. Middlebrooks adequately supports his legal conclusion—that pentobarbital is available to Tennessee for use in executions—by relying on the specific factual allegations discussed above. Defendants also argue that the only non-conclusory allegations are those already found insufficient in *Abdur'Rahman* and by this court. Although it is true that *Abdur'Rahman* considered that other states use pentobarbital in executions and found, after a trial, that fact insufficient to show pentobarbital's availability to Tennessee, the *Abdur'Rahman* court considered facts only from 2018. Middlebrooks plausibly alleges that, since then, the federal government has made it easier to obtain pentobarbital from foreign manufacturers, that the federal government and states have used pentobarbital in executions, and that Tennessee may have a source of pentobarbital and be able to obtain it. These additional facts were not considered in *Abdur'Rahman* and, accepted as true, are sufficient to infer that pentobarbital is available to Tennessee.

We have already addressed in an unpublished opinion whether the May 2019 OLC opinion and the federal government's announcement that it intended to begin carrying out executions using pentobarbital were sufficient to avoid dismissal on res judicata grounds. *See Sutton v. Parker*, 800 F. App'x 397 (6th Cir. 2020).[3] In *Sutton*, the plaintiff, a Tennessee death-row inmate and co-plaintiff in *Abdur'Rahman*, argued that Tennessee's three-drug lethal-injection protocol violated the Eighth Amendment and that res judicata did not apply because he presented new facts about the availability of pentobarbital to Tennessee. *Id.* at 398-400. The plaintiff, however, alleged only two new facts: the May 2019 OLC opinion concluding that the FDA "could not regulate the importation of drugs for use in executions," and a July 2019 announcement that the federal government would resume executions "to be carried out with a one-drug pentobarbital injection." *Id.* at 400-01. We concluded that res judicata applied. As to the May 2019 OLC opinion, we reasoned that it "has no legal effect upon prior injunctions issued by federal courts" and thus was "in significant tension" with the D.C. Circuit's decision in

---

[3]In *West v. Parker*, 783 F. App'x 506 (6th Cir. 2019), we also held that res judicata applied to *Abdur'Rahman*, but the plaintiff in *West* did not argue "that changed circumstances or new facts give rise to an exception rendering claim preclusion inapplicable." *Id.* at 517 (Moore, J., concurring). As a result, *West*'s relevance to this appeal is limited.

*Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013), which upheld an injunction against importing a different lethal-injection drug because doing so violated the Food, Drug, and Cosmetic Act (FDCA). *Sutton*, 800 F. App'x at 401 ("There is no basis to conclude that the OLC opinion lifts the injunction or will enhance Tennessee's ability to procure pentobarbital for use in executions in the immediate future."). We also explained that many manufacturers are unwilling to sell drugs to states for use in executions even if the drugs may be permissible to import. *Id.* And we noted that "Sutton 'offered no direct proof as to availability' of pentobarbital and could not identify a single manufacturer of the drug that could have provided it for use in executions at the time." *Id.* (quoting *Abdur'Rahman*, 558 S.W.3d at 623-24). Therefore, we held that "[t]he district court properly invoked res judicata" because the plaintiff "failed to demonstrate how the new facts may have affected the state courts' prior adjudication of his Eighth Amendment claim." *Id.*

As an unpublished opinion, *Sutton* is not binding, and is, in any event, distinguishable. *Sutton* addressed only two new facts and concluded those two facts were insufficient to alter the legal rights of the parties. *See Creech*, 281 S.W.3d at 381. Middlebrooks alleges additional facts that make his availability argument stronger, including, as to the May 2019 OLC opinion, that states have since applied for and received importation licenses. Although the May 2019 OLC opinion may, as we noted in *Sutton*, be "in significant tension" with the D.C. Circuit's decision in *Cook*, 733 F.3d 1, Middlebrooks has alleged facts that plausibly suggest that *Cook* will not frustrate Tennessee's ability to lawfully secure a license to import pentobarbital—i.e., that two states have obtained such a license and that a third is awaiting one.[4]

The parties also dispute the proper reading of *Bucklew* and its effect on this case. Middlebrooks argues that *Bucklew* made clear that the burden to plead availability is easily met and can be satisfied by plausibly alleging that a well-established protocol in another state is a potentially viable option. Defendants construe *Bucklew* as permitting prisoners to point to

---

[4]We also note that there is debate among the judges on the D.C. Circuit whether *Cook* held "that the FDCA regulates drugs when used for lethal injection in the course of an otherwise lawful execution." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 143 (D.C. Cir. 2020) (Rao, J., concurring in part and in the judgment and dissenting in part). Further, the Supreme Court has allowed executions to proceed where the inmates have live FDCA claims. *See Barr v. Purkey*, 141 S. Ct. 196 (2020) (Mem.) (vacating preliminary injunction issued on the basis that federal government's procuring pentobarbital likely violated the FDCA).

lethal-injection protocols that are not permitted by state statute to meet their burden of proposing a readily available alternative.  Under Defendants' reading of *Bucklew*, the Supreme Court is merely "clarifying what it means for a proposed alternative to be 'readily implemented,'" not "modifying the burden on death row inmates to show a proposed alternative is 'feasible' and 'available.'"  Appellees' Br. at 13 (quoting *Bucklew*, 139 S. Ct. at 1126-29).  Middlebrooks does not argue on appeal, as he did in the district court, that *Bucklew* constitutes an intervening legal decision that, by itself, allows him to avoid res judicata, *cf. Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) (explaining the change-in-law exception to issue preclusion); therefore, we need not decide that question.  Even putting that question aside, however, *Bucklew* supports our conclusion that other states' recent successes in obtaining pentobarbital constitute sufficient new facts to survive a motion to dismiss, as we agree with Middlebrooks that *Bucklew* makes clear that an inmate can, in some circumstances, sufficiently plead availability by pointing to other states' protocols.  *See Bucklew*, 139 S. Ct. at 1128 ("Finally, the burden Mr. Bucklew must shoulder under the *Baze-Glossip* test can be overstated. An inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law. . . . So, for example, a prisoner may point to a well-established protocol in another State as a potentially viable option."); *id.* at 1128-29 ("[W]e see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative assuming, of course, that the inmate is more interested in avoiding unnecessary pain than in delaying his execution."); *id.* at 1136 (Kavanaugh, J., concurring) ("[A]n inmate who contends that a particular method of execution is very likely to cause him severe pain should ordinarily be able to plead some alternative method of execution that would significantly reduce the risk of severe pain.").

Because Middlebrooks plausibly alleges new facts that allow us to reasonably infer that pentobarbital is available to Tennessee for use in executions, we reverse the district court's dismissal of Middlebrooks's facial claim based on res judicata.

**B.**

For his as-applied challenge, Middlebrooks alleges that he "has a long-standing and well-documented seizure order," and he "suffers from Major Neurocognitive Disorder, Schizophrenia, and Post-traumatic Stress Disorder."  R. 13, PID 156-57.  As a result of these conditions, Middlebrooks alleges that he is sure or very likely to become psychotic and experience seizures during death watch and when the execution team tries to set the IV in his veins, making it very likely that the IV will become dislodged and the lethal drugs will enter his muscles instead of his veins.  All of this, he alleges, will lead to extreme pain and torture.  As an alternative, he proposes nitrogen hypoxia.  Because the physical and mental-health conditions he relies on for his as-applied challenge were present at the time of *Abdur'Rahman*, and lethal injection has been the default method of execution in Tennessee since 2000, Middlebrooks does not argue that there are new facts or circumstances that post-date *Abdur'Rahman* that make res judicata inapplicable.

Rather, Middlebrooks argues that he could not have brought his as-applied challenge during the *Abdur'Rahman* litigation because it was not yet ripe for adjudication, as his claim depends on future and contingent events such as his execution date, the execution protocol, and his mental and physical condition.  Middlebrooks asks us to adopt a bright-line rule that an as-applied challenge to an execution protocol based on a death-row plaintiff's mental and physical conditions is not ripe until the government seeks the inmate's execution, which Tennessee has now done.[5]  According to Middlebrooks, a contrary holding would be absurd because it would require death row inmates to file as-applied challenges every time the state announces a new method of execution or changes the execution protocol.

Under Tennessee law, to determine whether a dispute is ripe, the court considers "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration."  *West v. Schofield*, 468 S.W.3d 482, 491 (Tenn. 2015) (*West II*) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)); *see also West v. Schofield*, 460 S.W.3d 113, 129-30 (Tenn. 2015) (*West I*) ("[A] declaratory judgment action cannot be used by a court to decide a theoretical question, render an advisory opinion which may help a party in another

---

[5]The Tennessee Supreme Court has not yet set an execution date for Middlebrooks.

transaction, or allay fears as to what may occur in the future." (internal quotations marks, citations, and emphasis omitted)).

The Tennessee Supreme Court has on rare occasions found that a challenge to a method of execution is unripe. In *West I*, the Tennessee Supreme Court concluded that the plaintiffs' claims that the lethal-injection protocol may be unconstitutional as applied in the future were not justiciable because "these claims are hypothetical and speculative." 460 S.W.3d at 131.[6] The claims at issue alleged that there was a substantial risk that the defendants would use pentobarbital obtained from non-FDA-approved facilities and that the persons performing the protocol's medical procedures would be impaired during executions. *Id.* at 129. The court also questioned whether the plaintiffs had adequately alleged as-applied claims, and noted its presumption that public officials in Tennessee carry out their duties lawfully and in good faith. *Id.* at 130-31.

In *West II*, the Tennessee Supreme Court held that the plaintiffs' challenges to the electrocution protocol failed both prongs of the ripeness test. 468 S.W.3d at 491-94. The court concluded that the challenges were not fit for judicial decision "because they involve a method of execution that does not now presently apply to the Inmates and will never apply to them unless one of two statutory contingencies occurs in the future." *Id.* at 492. The court also found that withholding adjudication would not impose a meaningful hardship on the parties because the plaintiffs were not forced to engage in or refrain from any conduct or to make a choice between "complying with a burdensome law or risking serious criminal or civil penalties." *Id.* (internal quotation marks and citation omitted). Thus, the plaintiffs' claims were unlike those in the usual case finding hardship. *Id.* Additionally, the court rejected the plaintiffs' argument that they might not receive sufficient notice to challenge the electrocution protocol in the future; although lack of notice might constitute a hardship under certain circumstances, the court found that the concerns about lack of notice were "insufficient to force the Defendants to litigate an array of unripe constitutional challenges . . . to a method of execution that does not now and may not ever

---

[6]Although the court did not specify that its decision was grounded in ripeness, a concurring opinion—disagreeing with the justiciability analysis—construed the majority opinion as rejecting the as-applied claims on ripeness grounds. 460 S.W. 3d at 135-36 (Wade, J., concurring in the judgment only).

apply to the Inmates." *Id.* at 494. To "ameliorat[e] the Inmates' notice concerns," the court nevertheless took steps to ensure that the plaintiffs would receive adequate notice in the future. *Id.*[7]

Middlebrooks's ripeness argument is not a perfect fit with these cases. In the *West* cases, the court found the claims unripe because the plaintiffs' challenges were not to a method of execution that presently applied, or to circumstances shown to presently exist. Here, in contrast, Middlebrooks's challenge depends on two circumstances that have existed for more than twenty years: lethal injection being the applicable method of execution, and Middlebrooks's vulnerabilities due to his mental and physical conditions.

Tennessee's ripeness doctrine mirrors that of the federal courts. *See West II*, 468 S.W.3d at 490-94 (relying on federal cases to define Tennessee's ripeness doctrine and to determine whether the claim was ripe). The parties have not cited any cases discussing ripeness of a claim like Middlebrooks's, and it does not appear that this issue arises very often. Despite the logic in Middlebrooks's argument, finding his as-applied claim unripe until the State of Tennessee moved to set his execution date, as he proposes, is inconsistent with federal courts' emphasis on inmates bringing claims early enough to avoid a stay of execution. For example, *Bucklew* involved an inmate challenging Missouri's lethal-injection protocol as applied to him due to his rare medical condition. 139 S. Ct. at 1118. Although not necessary to decide the case, the Supreme Court lamented the petitioner's "secur[ing] delay through lawsuit after lawsuit," and reminded courts that last-minute applications that could have been brought much earlier may be grounds to deny a stay request. *Id.* at 1133-34; *see Hill v. McDonough*, 547 U.S. 573, 584-85 (2006) (approving of lower court decisions dismissing suits that were speculative or filed too late and explaining that "piecemeal litigation [presumably] would raise similar concerns"); *Gomez v. U.S. Dist. Court for the N. Dist. of Calif.*, 503 U.S. 653, 653-54 (1992) (per curiam) (vacating stay of execution and stating that the inmate's § 1983 method-of-execution claim challenging lethal gas "could have been brought more than a decade ago"). *But see Siebert v. Allen*, 506 F.3d

---

[7]In *Abdur'Rahman*, the plaintiffs whose execution dates had been set moved to amend their complaint to add as-applied claims pertaining to the use of compounded midazolam, which the trial court denied on the basis of undue delay. 558 S.W.3d at 619-20. The Tennessee Supreme Court affirmed, finding that the plaintiffs could have brought the as-applied claims "long before" they did, and noting that the protocols in effect six months and three years prior to their motion to amend included compounded formulations. *Id.* at 620 & n.17.

1047, 1049-50 (11th Cir. 2007) (finding that the plaintiff did not unreasonably delay in filing his as-applied challenge based on his medical conditions where he filed his as-applied challenge "immediately" after being diagnosed with pancreatic cancer, one of the bases for his challenge). Justice Sotomayor disagreed with the majority's reasoning in *Bucklew* but invoked situations where the inmate would not be aware of the basis for his claim until execution is imminent. *Bucklew*, 139 S. Ct. at 1147-48 (Sotomayor, J., dissenting) (discussing "[m]eritorious claims [that] come to light even at the eleventh hour," shifting execution protocols and procedures, and late-disclosed information from the state).

Our own cases have discussed early filings of method-of-execution challenges in circumstances where there are strong arguments that such challenges are not ripe. *See Cooey v. Strickland*, 544 F.3d 588, 591 (6th Cir. 2008) (Gilman, J., concurring) (arguing that the rule from *Cooey v. Strickland*, 479 F.3d 412, 422 (6th Cir. 2007) (*Cooey II*)—that the plaintiff's method-of-execution challenge ordinarily accrues at the end of direct review in state court or after time to seek direct review has expired, or when he knew or should have known of the basis of the claim—means that "Section 1983 claims may well expire before they have properly ripened," including the as-applied challenges in that case). *Compare Alley v. Little*, 186 F. App'x 604, 607 (6th Cir. 2006) (rejecting the plaintiff's argument that courts are prohibited "from considering challenges such as [a § 1983 challenge to a method of execution] before a [plaintiff's] execution reaches imminence"), *with Alley v. Little*, 452 F.3d 621, 624-25 (6th Cir. 2006) (Martin, J., dissenting from denial of rehearing en banc) (arguing that the plaintiff's case was not ripe until he refused to make a selection about the method of execution and lethal injection was selected by default).

Although very few of these cases expressly address the ripeness of an as-applied challenge like Middlebrooks's, and most of them deal with whether to grant stays of execution, the emphasis on bringing method-of-execution challenges early enough to avoid the need for a stay of execution is in tension with Middlebrooks's argument that his as-applied challenge was not ripe until execution was imminent. And once the State of Tennessee moves to set an execution date, the Tennessee Supreme Court may set an execution date as early as thirty days

after the order granting the state's motion, which raises the possibility that these claims could not be litigated without a stay of execution. *See* Tenn. Sup. Ct. R. 12.4(E).

The nature of Middlebrooks's challenge puts him on somewhat firmer footing. Middlebrooks's challenge is based specifically on his mental and physical conditions. As he argues, given the lengthy passage of time between a death sentence being imposed and carried out (Middlebrooks was initially sentenced in 1989), it makes little sense to require an inmate to raise this type of challenge based on circumstances existing potentially decades before an execution date. Putting aside the changes to execution methods and protocols that have occurred since 1989, a challenge based on a plaintiff's unique mental and physical conditions will often change as time passes, given that conditions could deteriorate or improve as a person ages or as treatments change.

Middlebrooks's theory of ripeness finds support in the Supreme Court's determinations about the appropriate time to consider a mental-incompetency claim. It is unconstitutional to execute someone who is insane. *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986). Therefore, death-row inmates may challenge their executions on that basis. But courts do not usually entertain such challenges until execution is imminent given the possibility that an inmate's condition will deteriorate or improve prior to execution. *See Panetti v. Quarterman*, 551 U.S. 930, 943, 946 (2007); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998) (explaining that "because his execution was not imminent . . . his competency to be executed could not be determined at that time"); *Van Tran v. State*, 6 S.W.3d 257, 263 (Tenn. 1999) ("The issue of competency to be executed . . . is generally not considered ripe until execution is imminent."), *abrogated in part by State v. Irick*, 320 S.W.3d 284 (Tenn. 2010). In *Alley*, in explaining why the plaintiff's challenge to the method of execution was ripe before his execution was imminent, we distinguished the plaintiff's challenge in that case from a *Ford* claim, reasoning that "claims involving mental competency are inherently different from the § 1983 petition before us in at least one respect: mental competency is subject to variance over time. It is indeed possible that last-minute first-instance *Ford* petitions could be justified by a change in a defendant's mental health." 186 F. App'x at 607; *see also Cooey II*, 479 F.3d at 423 (quoting approvingly this portion of *Alley*).

Just as mental competency is subject to variance over time, so too are physical and mental-health conditions like Middlebrooks's. They can improve over time with new treatments or medications; or they can get worse as a person ages, treatments stop working, or new medications or treatments prove ineffective. We have, however, rejected a similar argument, albeit in a different context. In *In re Tibbetts*, the petitioner alleged that imposing lethal injection on him was unconstitutional due to his physical and psychological ailments. 869 F.3d 403, 406, 407 (6th Cir. 2017) (order). A divided panel concluded that this claim filed in a habeas petition was second or successive because "it was ripe for review when the first habeas petition was filed," as it was "indisputable that these physical and psychological characteristics were known when he filed his first habeas petition." *Id.* at 406, 407. The panel majority also rejected the argument that *Panetti* and *Martinez-Villareal* required a different conclusion, finding that there was no authority "supporting the analogy" of mental-incompetency claims to the claims of the petitioner. *Id.* at 407. Although, the panel "fully agree[d] with *Ford*'s recognition of 'the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity,'" the order explained that the panel majority knew "of no comparable solicitude toward those who claim not to be well enough *physically* to face execution." *Id.* (quoting *Ford*, 477 U.S. at 409).

Although we find this to be a difficult question, we conclude that Middlebrooks's as-applied § 1983 challenge was ripe at the time of the litigation in *Abdur'Rahman* in 2018 due to the specific circumstances of this case. Those relevant particular circumstances include that Tennessee adopted lethal injection as its default of method of execution in 2000 and had carried out multiple executions using that method by the time of the 2018 *Abdur'Rahman* case;[8] that Middlebrooks's as-applied challenge would pertain to all forms of lethal injection, not one specific protocol; that Middlebrooks's direct appeal, state collateral appeals, and federal collateral appeals were concluded when the complaint in *Abdur'Rahman* was filed in 2018;[9] and

---

[8]*See* Tenn. Dep't of Corr., *Tennessee Executions*, https://www.tn.gov/correction/statistics-and-information/executions/tennessee-executions.html.

[9]The Supreme Court denied certiorari review of Middlebrooks's federal habeas petition on December 4, 2017, 138 S. Ct. 503, and denied rehearing on February 20, 2018, 138 S. Ct. 1046, the same day the complaint in *Abdur'Rahman* was filed.

that Middlebrooks's operative complaint does not allege that his conditions have materially worsened or that he was unaware of the basis of his claim prior to his joining the complaint in *Abdur'Rahman*. Especially critical to our conclusion is the fact that Middlebrooks's claim does not rest on any newly developed individual condition that would render impermissible the application of *res judicata* principles.

## III.

For the reasons set forth above, we AFFIRM the district court's dismissal of Middlebrooks's as-applied claim, REVERSE the dismissal of Middlebrooks's facial claim, and REMAND for further proceedings.